-FILED-

AUG 12 2020

At
ROBERT N. ___OVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

United States v. Larry Smith
Northern District of Indiana
        Hammond Division
Criminal No. 2:05-CR-179

          Motion for Compassionate Release
          pursuant to 18 U.S.C. 3582(c)(1)(A)(i)

Honorable Chief Judge Teresa Springmann:

      I am writing to request that the court grant my
motion for compassionate release under 18 U.S.C. 3582(c)(1)(A)(i)
and order that my sentence; 1) Be either reduced to time
served or that the remaining 28 months be served on home
confinement; and 2) that my supervised release be
reduced to 10 years.

      This motion should be granted in part to fix the
great disparity between my case and others from this
Court and because of the global COVID-19 pandemic. Both
of which present an "extraordinary and compelling reason"
for compassionate release.

                    COVID-19

      My incarceration exposes me to a particularized
risk of contraction of the disease. The virus thrives in
densely packed populations and FCI Loretto not only has
positive cases, staff and inmate alike, but is ill-equipped
to contain the pandemic and prevent the spread of COVID-19

                    — 1 —

to other staff and inmates.

Though the virus is just now getting into this facility, with a staff member testing positive sometime around the 16th of July, there has been 14 staff and 28 inmates identified as being positive for Covid-19. There are still test results pending as of this writing. They do not have space available to house multitides of positive inmates, and those in contact with them due to living within their cells, quarantined off from the general population. Due to one unit (North 5) having to be cleared out because of flooding from sewer issues, they now only have two units to quarantine individuals. One they have positive inmates in, it only holds roughly 26 inmates (12 of which are occupied) and one they are using to house inmates that were in the positive cases cells, that unit is open bay with only about 3 feet in between bunks for seperation.

They now have begun sending inmates back from isolation after 10 days, even though they have not tested negative, stating in a memo from Warden Moser dated July 31st that new CDC guidelines regarding individuals who have tested positive is as follows: 1) Asymptomatic individuals can be released from medical isolation 10 days after the date of first positive; 2) Individuals with mild to moderate symptoms can be released from medical isolation 10 days after symptoms onset and resolution of fever for at least 24 hours without the use of fever-reducing medication and with improvements of other symptoms; 3) Testing for release of Covid-19 isolation is no longer recommended.

-2-

Whether or not these are the correct guidelines of the day from the CDC, I do not believe they are adequate in a prison housing situation. The inmates in the open dorm unit being quarantined for being in the room with positive cases on the other hand remain in quarantine, even though they have 2 or more negative test results, due to thier time starting over everytime someone new is placed in the unit. Due to this prolonged stay, several of these inmates contracted the virus from the newly quarantined inmates. This alone shows the facility is ill-equipped to prevent the spread of the virus.

Social distancing is impossible in FCI Loretto. I live in an eight man room. Other rooms on my unit range from 4 to 18 man rooms. Some other units are cubicle style living with 6 to 8 men piled in. Each area is below the 60 sq. ft. per inmate prescribed by the BOP's own Program Statement 1060.11. And with 2 men to a bunk, one is sleeping within 3 feet of another person—half of the distance we are advised to remain apart.

My unit houses roughly 160 inmates who share a 6 foot wide hallway, two sinks, two urinals, six toilets, eight showers, two drinking fountains and one ice machine. Inmates also share five phones and eight computers, leaving them touching the same buttons, receivers, keyboards, mouses, and thumbprint readers. No hand sanitizer is made available nearby, nor is any sold on commissary. The bathrooms are only cleaned once or twice a day (during normal operation but during this "quarantine" they aren't being cleaned at all) but no bleach, alcohol, or ammonia based cleaners are used.

Also, during this "quarantine", they have staff moving freely about the institution, from one unit to the next, with no personal protective equipment beside a mask and inmates are still being utilized to work in the chow hall, preparing meals for the rest of the population. Both of these situations create a much higher risk of spreading the virus to others, inmate and staff, throughout the institution.

I am currently on Chronic Care for shoulder pain (caused by arthritis or a rotator cuff tear, both of which they say I may have due to X-Ray and evaluations), Gastro-esophageal reflux disease (GERD), and Irritable Bowel Syndrome (IBS). I am taking Meloxicam (15mg) and Tylenol (650mg) for my shoulder, Omeprazole (20mg) for GERD, and Loperamide (2mg) for IBS. (Exhibit 1)

I used to take Dicyclomine (20mg) and Desiprimine (25mg) for a couple years to manage pain in my abdominal caused from complications with IBS, but they removed me from Dicyclomine due to it not being formulated for use in the BOP and I had them take me off of Desiprimine due to negative side effects.

And though not diagnosed, as of yet, my blood pressure is high, last reading being 143/74 (hyper-tension zone) on April 24th (Exhibit 2), but true to BOP medical history, it has not been followed up on.

Lastly, I was a heavy smoker (1½ packs a day) for years before my incarceration, which according to the CDC, puts me at a heightened risk of complications with the virus.

Even with relatively good health, I am not immune from infection. Data from the Centers of Disease Control and Prevention

—4—

shows that nearly 40 percent of patients hospitalized from Coronavirus were 20 to 54 years of age. (Younger adults make up a big portion of Coronavirus hospitalizations in U.S., The New York Times, — at https://nytimes.com/2020/03/18/health/Coronavirus-young-people.html).

Conditions of confinement create ideal environments for the transmission of contagious disease. (Joseph A. Bick, 2007. Infection Control in Jails and Prisons. Clinical Infectious Disease 45 (8): 1047-1055, at https://doi.org/10-1086/521910).

Prisons are petri dishes for contagious respiratory illnesses. Inmates cycle in and out of jails and prisons and people who work in facilities leave and return daily, putting inmates, staff, and the public at a higher risk. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings." (Achieving a fair and effective Covid-19 response: at https://bit.ly/2TNcNZY).

<u>Disparity</u>

Over the years, and especially since the Sentencing Commissions Report to Congress on Federal Pornography Guidelines in December of 2012, courts have been giving downward departures in 2g2.2 based cases due to the belief they are seriously flawed.

In this circuit, in 2018, pornography cases were sentenced within the guidelines just 25.8% of the time, with the vast majority of the cases (63.4%) being sentenced

below the guidelines range due to downward departures. The outcome being that defendants sentences had a mean of 99 months and a median of 84 months. (United States V. Smith, Cause No. 1:18-CR-64-HAB (Nov. 4, 2019), 2029 U.S. Dist. Lexis 190757). Much lower than the 240 months I received back in 2008.

Allowing me a sentence reduction or to serve the remaining 28 months of my current sentence on home confinement is the only prudent and just response to this Motion due to the "extraordinary and compelling circumstances created by the Coronavirus and disparity in my case.

I am not a danger to the community, and release plan adheres to the mandates of Section 3553(A), particulary in light of the events of the current pandemic. I respectfully ask this court to consider this motion on an expedited basis as the risk to my health multiplies with each passing day.

## Background

Before I pled guilty to Receipt of Child Pornography, Honorable Rudy Lozano informed me I was facing a minimum of 5 years of incarceration and NO supervised release, and a maximum of 20 years of incarceration and 3 years supervised release. In the end, on Feburary 8th, 2008, I was sentenced to 20 years of incarceration and Lifetime supervised release.

That was a within guideline range sentence (with no downward departures or variances), 5 months over the minimum of the 235-293 month range and at the top of that statutory maximum the charge carried. This calculation came from a criminal history level I and 38 guideline points. The 38 was a result of 22 point base

offense and enhancements for the following: Computer use (2 points); images under 12 years of age (2 points); Distribution (5 points); Sado/masochism images (4 points); and 600+ images (5 points) for a total of 40 points.

The government chose to only give 2 points for my acceptance of guilt. Had they given me the additional point, my guideline range would have been 210-262 months. The low end of which would have been not only over twice as high as the average pornography sentences were in 2018, but would also put me at 98% of that sentence completed, with an outdate in October of this year, as opposed to my current outdate of December 6th, 2022 (Exhibit 3).

Besides the point not given for acceptance of guilt, there are multiple enhancements that applied in my case that have been under scrutiny and deemed flawed by judges across the country, including this circuit. (United States v. Schinbeckler, No. 1:09-CR-77-TLS. Sentence 66 months - guidelines 97-121; United States v. Brown, No. 1:09-CR-177 Sentence 60 months - guidelines 210-240; United States v. Tapp, No. 1:09-CR-123 sentence 60 months - guidelines 151-188; United States v. Esterline, No. 1:12-CR-66 sentence Time Served - guidelines 78-97; United States v. Topp, No. 1:12-CR-83 sentence 60 months — guidelines 135-168; United States v. Ditiway, No. 1:12-CR-86 sentence 60 months — guideline 97-120; United States v. Perry, No. 1:13-CR-84 sentence 60 months - guidelines 121-151; United States v. Smith, No. 1:18-CR-64-HAB sentence 78 months — guidelines 135-168). Mainly, but not limited to, the enhancements for computer use and quantity of images. Just those two enhancements added 7 points, that if removed, would drop my guidelines to 135-168

— 7 —

months without the extra point for acceptance of guilt.

The Sentencing Commissions Report to Congress had also recommended Receipt be aligned with Possession, instead of Distribution, noting that Receipt and Possession are of the same act. A belief that this circuit has also noted. (United States v. Smith, No. 1:18-CR-64-HAB) An act, that if done, would put me at a calculation of 34 points, a guideline range of 151-188, with no other variances on the enhancements.

More recently, a proposal by the primary staff author of the Commissions 2012 Report to Congress, former Deputy Staff Director (from 2009 to 2019) for the Sentencing Commission, Brent Evan Newton, entitled "A partial fix of a Broken Guideline : A proposed amendment to Section 2g2.2 of the United States Sentencing Guidelines." (Exhibit 4) proposes an overhaul to the guidelines that may be done by the Commission without the need of Congress, when the Comission finally has the four-Commissioner quorum needed to hold votes.

In his proposal, Mr. Newton excellently lays out the history behind the flawed guidelines and what could be done to fix Section 2g2.2. Which going by his proposed amendments, in my particular case, would give me a guideline calculation as follows :
(a) Base Offense level: 24 ; (b)(2)(A)(iii) : +4 ; and (b)(2)(B)(i) : +4, for a total of 32 points. With the 2 points the government gave for acceptance of guilt, that would be a guideline level 30, with a range of 97-121 months. The high end being half of my current sentence.

Also in Mr. Newtons proposal, he points out on pages 11-12, that "the current 28.4% within-range rate is actually inflated by

the relatively common practice of plea agreements in which the parties stipulate that the guidelines should apply in a particular way — usually by removing the use-of-computer enhancement or sado-masochism enhancement — in order to reduce a defendants guideline range. Judges who follow those plea agreements and sentence within the stipulated guideline range are classified as having imposed "within-range" sentences by the Commission — when in fact their sentences are effectively downward "variances". " It's safe to say that this courts 25.8% within guideline range sentence percentage is also inflated due to this practice.

The final change recommended in the proposal is titled "One Additional Proposed Fix: A Change in the Recommended Lifetime Term of Supervised Release in USSG §5D1.2(b)" on pages 31-32, and goes on to state, "In its 2012 report, the Commission noted that this recommendation was first included in Section 5D1.2 at a time when the maximum term of supervision for child pornography offenses was 3 years. When Congress raised the maximum term of supervised release for child pornography offenses to Life in 2003, that application note had the effect of recommending lifetime terms of supervised release for all child pornography defendants. The commission thus never intended that recommendation of lifetime supervision." "Lifetime terms should be reserved for the most serious, dangerous offenders." I do not meet that criteria. Hence the 10 year supervision I am asking for today.

Basically speaking, if 2g2.2 guidelines were not so flawed, I would have gotten a much lighter sentence, not only of the one I received back in 2008, but also of the one I am asking the courts to grant today.

I understand that in determining whether my sentence should be reduced based on an "extraordinary and compelling reason," this Court must consider whether I present a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). Under the present regime, the existance of extraordinary and compelling circumstances confers on this court the authority to consider the relevant 18 U.S.C § 3553(a) factors in determining whether a sentence reduction is appropriate.

I am an idea candidate for release. I am a Non-violent offender — (Though consider cases in which courts granted compassionate release in light of Covid-19, despite violent or otherwise dangerous offense history. E.g. United States V. Williams, No. 3:04cr 95/MCR, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) bank robbery and firearm offenses; United States V. McCarthy, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) armed robbery; United States V. Scott, No. 95-202-CCB-2, 2020 U.S. Dist. Lexis 84313 (4th cir. Md. May 13, 2020) armed bank robberies.)

I have a low security classification, am incarcerated at a low security institution, have a BOP administered PATTERN score of Low risk of recidivism and am now 38 years old as opposed to 23 at the time of offense. It is well-established that recidivism declines with age.

Also, I have strong support in the community, which will be

— 10 —

essential to my successful reintegration to society upon release. I have maintained close ties with my family and other community members throughout my time in prison. Backed by this support, and in light of my history, there is no reason to believe I would present a danger to society.

I have now been incarcerated for 178 months, which is 86.8% of the time I would have to do if my sentence remained as it is at this present time, and 89.4% of the time I have to do until my home confinement eligibility date of June 6th, 2022 (Exhibit 3) — 22 months from now. During this time, I have attempted to grow positively by participating in programs, working, and learning job skills that will benefit my life in society. I have had two infractions since my incarceration, both of which I am not proud of, immediately accepted responsibility for my actions and have done what I could to move forward and better myself. The worse was from self medicating after my father passed away. Since then I have taken two drug education classes, the 12-hour and the 40-hour courses, on top of a wide range of other classes over the years, from music to art and stress management to critical thinking (Exhibit 5), all of which have been beneficial in teaching me coping skills I had not possessed before.

There is no doubt that my criminal conduct was serious and I am in no way trying to diminish the seriousness of my crime, nor do I condone or justify my actions that got me incarcerated in the first place. I am only stating that I believe the time I have served (178 months) and 10 years supervised release would be sufficient enough to punish me for my crime, show

-- 11--

the seriousness of the offense, and limit the disparity between my case and others. I can only pray the Courts agree.

I am not the same man I was in 2005 when I committed my offense. I have grown alot over the last 15 years and I am ready to rejoin society and successfully remain a part of it as opposed to a part of the correctional system.

I have formulated a 4-part release plan that will adequately address the concerns presented by Covid-19 and ensure a successful transition into the community.

The first part has been in effect the last few years with the saving of money for release. To date, between my account here and money saved at home, I have just over 2,500 dollars to help me secure my drivers license, car, and insurance to be able to get to and from work. And since my sister still has my clothing and tools stored at her house, I have a leg up on being prepared for the work force. Also, my mother and step-father (Brenda and Mike Gething, who may be contacted at (708) 288-3437) and my sister and brother-in-law (Jennifer and Sam Geeve, who may be contacted at (219) 677-2397) have all voiced their willingness to help with rent, food, etc for as long as I need to get on my feet. They are awaiting a call from this court or probation office to answer any questions, if either choose to call.

The second part is to relocate to Bremen Kentucky, which will benefit me in providing a fresh start and a solid living arrangement and support system. The place I will be living has 2 bedrooms, one bath, and a kitchen/living room combo. It

is owned by my cousin and her husband, who I have known for 22 years and is like a brother to me, and is located directly next door to them. They have agreed to allow me to live there rent free for as long as I need and to aid me in anything else I need to get adjusted. I have agreed to pay rent as soon as I find employment and to pay extra each month to make up for the time they assist me. Where they do not deem that necessary, I do. Having them next door is going to help me in transitioning from prison to society as well as to a new location, and beings how Bremen is only 5 hours away from my mother and sister, I will be able to visit (probation approved) and receive visits from family easily. Also, having my own home is going to help me in finding my place in society without being a burden to anyone and will make self-quarentining alot easier if the need should arise. If the courts or probation have any questions or would like to check on the living conditions, they may do so by contacting Johnny and Christy Lanham at (270) 543-0559.

    With a stable place to live, support structure in place, a license and vehicle to get to and from work, the third part of my release plan, when the courts and U.S. Probation office permits it, will be to acquire employment in either satellite/cable installation as I did before my incarceration or in plumbing, in which is a skill I have learned within the BOP institutions, with my options open to any lawful employment I may get to afford living expenses and medical insurance.

    The fourth and final part of my plan is to spend my free

time with my family, as I have lost several family members (father, grandmother, grandfather, aunt, uncle, and nephew) since I've been gone and would like to spend as much time with my loved ones as possible before losing anyone else.

<u>Conclussion</u>

In this case, while the 30 day waiting period has not yet passed (I requested compassionate release from Warden Moser on July 18th, she passed it on to the Unit Manager — Mr. Miles — on July 23rd, He passed it on to my case Manager—Ms. O'Donnell— on July 29th), I ask that this Court address this Motion without delay. Section 3582(c)(1)(A)'s 30 day waiting period is not a jurisdictional bar to the courts authority to order compassionate release. Accordingly, the provision is subject to well-recognized exceptions that apply here. Due to mortal threat posed by the rapid spread of the virus in prison populations, (according to BOP.gov/koronavirus, since June 25th, there has been over 3,200 inmates tested positive and over 35 more BOP prisons added to the active COVID-19 case list, including FCI Loretto, where I am located), requiring a 30 day delay in this courts granting of this motion would be futile and cause an undue prejudice.

Also, persuing administrative remedies would be futile in this case because BOP has presumptively deemed me ineligible for relief. BOP represents that, on March 26th, it "began immediately reviewing <u>all</u> inmates who have COVID-19 risks... to determine which inmates are suitable for home confinement." Because BOP has not identified me for early release or home

— 14—

Confinement, and has made no representation that it intends to grant my request, the court can find that the BOP has deemed me to be unsuitable for home confinement or early release. Accordingly, it would be futile for me to pursue administrative remedies.

I now respectfully request that this court grant my request for compassionate release and impose the following:
1) That my sentence be either reduced to time served or that the remaining 28 months be served on home confinement;
2) That my supervised release be reduced to 10 years;
3) That within 72 hours of my release, I contact the U.S. Probation Office by phone for specific reporting instructions;
4) That I remain confined to my home in Bremen Kentucky except for activities approved by the U.S. Probation Office for 14 days, or until the Court deems necessary.

Respectfully Submitted,
Larry Smith
August 4th, 2020

Larry Smith
Fed. Reg. # 08520-027
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

| Inmate Name: SMITH, LARRY GUY | | Reg #: 08520-027 |
| Date of Birth: 05/17/1982 | Sex: M   Race: WHITE | Facility: LOR |
| Encounter Date: 04/24/2020 10:59 | Provider: Swindell, Kim MD/CD | Unit: E03 |

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|------|------|-----|-----|--------------|----------|
| 04/24/2020 | 11:00 LOR | 197.0 | 89.4 | | Swindell, Kim MD/CD |

## Exam Comments

GEN: NAD, non-toxic appearing
HEENT: PERRL, EOMI, MMM, O/P without lesion, neck supple, no LAD, thyroid normal size and consistency without nodularity; no bruit
Lungs: CTA B/L
Heart: RRR without murmur/rub/gallop
Abd: soft, NT/ND, NABS, no HSM
Ext: warm, WP, brisk cap refill
Skin: no lesions noted
Neuro: normal tone/power/reflexes/gait
MS: L shoulder without obvious deformity; no atrophy noted; pain with resisted abduction and external rotation; active ROM about 120 degrees with flexion and abduction; tenderness to palpation over the anterior rotator cuff; negative drop-arm test; negative lift-off subscapularis; + Neer's and Hawkins-Kennedy tests

## ASSESSMENT:

Gastro-esophageal reflux disease without esophagitis, K219 - Current

Pain in unspecified joint, M2550 - Current - *L shoulder; possible rotator cuff tear*

## PLAN:

**New Medication Orders:**

| Rx# | Medication | | Order Date |
|-----|-----------|---|-----------|
| | Omeprazole Capsule | | 04/24/2020 10:59 |
| | **Prescriber Order:** | 20mg Orally  -  daily x 180 day(s) | |
| | **Indication:** Gastro-esophageal reflux disease without esophagitis | | |

**Renew Medication Orders:**

| Rx# | Medication | | Order Date |
|-----|-----------|---|-----------|
| 118215-LOR | Loperamide Capsule  2 MG | | 04/24/2020 10:59 |
| | **Prescriber Order:** | Take one capsule (2 MG) by mouth three times daily before meals AS NEEDED PRN x 180 day(s) | |
| | **Indication:** Irritable bowel syndrme | | |
| 122665-LOR | Meloxicam 15 MG Tab | | 04/24/2020 10:59 |
| | **Prescriber Order:** | Take one tablet (15 MG) by mouth each day for 30 days x 180 day(s) | |
| | **Indication:** Pain in unspecified joint | | |
| 119481-LOR | Acetaminophen 325 MG Tab | | 04/24/2020 10:59 |
| | **Prescriber Order:** | Take two tablets (650 MG) by mouth every six hours for 7 days as needed for pain x 180 day(s) | |
| | **Indication:** Pain in unspecified joint | | |

**New Laboratory Requests:**

| Details | Frequency | Due Date | Priority |
|---------|-----------|----------|----------|
| Chronic Care Clinics-Gastrointestinal-CBC w/diff | One Time | 03/08/2021 00:00 | Routine |
| Chronic Care Clinics-Gastrointestinal-Comprehensive Metabolic Profile (CMP) | | | |

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|------------------------|-------------|----------------------|----------|-----------|----------|
| Radiology | 06/24/2020 | 06/24/2020 | Routine | No | |
| Subtype: | | | | | |

*Exhibit 2*

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: SMITH, LARRY GUY | | Reg #: 08520-027 |
| Date of Birth: 05/17/1982 | Sex: M   Race: WHITE | Facility: LOR |
| Encounter Date: 04/24/2020 10:59 | Provider: Swindell, Kim MD/CD | Unit: E03 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT  1**        **Provider:** Swindell, Kim MD/CD

**Chief Complaint:** Chronic Care Clinic

**Subjective:**    Pt presents to CCC; all FCI Loretto MLP notes and activities pertaining to CCC reviewed, if applicable.

1)    GI: pt prescribed loperamide for h/o irritable bowel syndrome
2)    ORTHO/RHEUM: pt reports that "My left shoulder is causing me pain and waking me up at night." Reportedly, this has been occurring for about 6 months. Pt reports "dull ache" that at times becomes "sharper pains." Pt reports that he "dislocated my shoulder when I was fourteen" and denies any recent re-injury or trauma event; pt localizes symptoms to the anterior/superior aspect of L shoulder; symptoms are exacerbated by shoulder flexion and abduction; pt has been previously evaluated by his PCP, issued appropriate home exercises, NSAID, analgesic, and activity modification for >6 weeks

ROS:
Denies pain presently. Denies HA, visual loss, dizziness, syncope, chest pain with or without exertion, dyspnea, abdominal pain, fever, joint swelling,. Denies abdominal pain, vomiting, diarrhea. Denies testicular pain. Denies medication side-effects.
Denies depressive symptoms, anhedonia, lack of appetite, sleeping problems, depressed mood, suicidal ideation, homicidal ideation. Denies anxiety or ruminating thoughts. Denies hallucinations and delusions.
Pertinent labs:
4/6/20
U/A: neg
BUN: 17
Cr: 0.87
GFR: >60
Fasting Blood Glucose: 83
Hgb 14.7; Hct 42.2; plt 251

**Pain:**    No

**Seen for clinic(s):** Gastrointestinal, Orthopedic/Rheumatology

**Added to clinic(s):** Orthopedic/Rheumatology

**OBJECTIVE:**

**Pulse:**

| Date | Time | | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|---|
| 04/24/2020 | 11:00 LOR | | 78 | | | Swindell, Kim MD/CD |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 04/24/2020 | 11:00 LOR | 14 | Swindell, Kim MD/CD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 04/24/2020 | 11:00 LOR | 143/74 | | | | Swindell, Kim MD/CD |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|

*Exhibit 3*

```
   LORBR  540*23 *              SENTENCE MONITORING          *    01-13-2020
  PAGE 001          *           COMPUTATION DATA             *    08:15:59
                                 AS OF 01-13-2020


REGNO..: 08520-027 NAME: SMITH, LARRY GUY


FBI NO...........: 641875WB2          DATE OF BIRTH: 05-17-1982  AGE:  37
ARS1.............: LOR/A-DES
UNIT.............: SOUTH             QUARTERS.....: E03-073L
DETAINERS........: NO               NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 06-06-2022

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  12-06-2022 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 010 ------------------------

COURT OF JURISDICTION..........: INDIANA, NORTHERN DISTRICT
DOCKET NUMBER..................: 2:05CR179-001
JUDGE..........................: LOZANO
DATE SENTENCED/PROBATION IMPOSED: 02-11-2008
DATE COMMITTED.................: 04-16-2008
HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED..............: NO


                FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00        $00.00         $00.00       $00.00

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO     AMOUNT:  $00.00

---------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....: 512     18:2251-2,2260 OBSCENE MATTR    FSA INELIGIBLE
OFF/CHG: 18:2252(A)(2), RECEIVING CHILD PORNOGRAPHY (CT.3).

SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
TERM OF SUPERVISION............: LIFE
DATE OF OFFENSE................: 10-11-2005




G0002      MORE PAGES TO FOLLOW . . .
```

# A PARTIAL FIX OF A BROKEN GUIDELINE: A PROPOSED AMENDMENT TO SECTION 2G2.2 OF THE UNITED STATES SENTENCING GUIDELINES

## By Brent E. Newton[1]

## I.    Introduction

Except for the criminal penalties for crack cocaine offenses,[2] no specific federal non-capital penalty structure has been more widely criticized than USSG § 2G2.2 and the corresponding federal penal statutes, 18 U.S.C. §§ 2252 & 2252A.[3] Together, those provisions govern penalties for child pornography offenses other than those involving actual production of child pornography (henceforth, "non-production offenses").[4]  Indeed, one of the leading sources of criticism has been

---

[1] Adjunct Professor of Law, America and Georgetown Universities; Of Counsel, Gerger, Khalil & Hennessy.  The author served as Deputy Staff Director of the United States Sentencing Commission from 2009 until 2019 and was the primary staff author of the Commission's December 2012 report to Congress concerning federal child pornography offenses, discussed below.  His proposal for an amended version of USSG § 2G2.2 does not reflect the position of the Commission.

[2] The history of federal crack cocaine penalties is thoroughly chronicled in Smita Ghosh, *Congressional Administration During the Crack Wars: A Study of the Sentencing Commission*, __ U. PENN. J. OF L. & SOCIAL CHANGE __ (forthcoming in Fall 2019).

[3] Carol S. Streiker, *Lessons from Two Failures: Sentencing for Cocaine and Child Pornography under the Federal Sentencing Guidelines in the United States*, 76 LAW & CONTEMP. PROBS. 27 (2013).

[4] *See, e.g.*, *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017); *United States v. Pyles*, 862 F.3d 82, 98 (D.C. Cir. 2017) (Williams, J., dissenting); United *States v. Grober*, 624 F.3d 592 (3d Cir. 2010); *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); *United States v. R.V.*, 157 F. Supp.3d 207 (E.D.N.Y. 2015); Melissa Hamilton, *Sentencing Adjudication: Lessons from Child Pornography Nullification*, 30 GA. ST. U. L. REV. 375 (2014); Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, 24 FED. SENT'G RPTR. 108 (2011).

the United States Sentencing Commission, whose 300-plus-page report to Congress in December 2012, *Federal Child Pornography Offenses*, made a compelling case for changing both the guideline and, to a lesser degree, the statutes. The Second Circuit has interpreted the Commission's report as "effectively disavow[ing] § 2G2.2."[5]

Although the best solution to the problems with section 2G2.2 would be to completely scrap the current guideline and rewrite it from scratch, such a change by the Commission would require congressional authorization. As I discuss below, Congress appears unwilling to allow the Commission to completely rewrite the guideline. However, as I also explain, there is a partial – and quite significant – fix available without congressional permission. That partial fix could be best accomplished by the Sentencing Commission in an amendment to section 2G2.2. If the Commission does not amend the guideline, then my proposal provides a detailed roadmap for federal district judges to "vary" from the current, broken guideline pursuant to the authority granted by the Supreme Court in *United States v. Booker* [6] and *Kimbrough v. United States*.[7]

---

[5] *Jenkins*, 854 F.3d at 190.

[6] 543 U.S. 220 (2005) (permitting district judges to "vary" below the sentencing guidelines, which the Court declared "effectively advisory").

[7] 552 U.S. 85 (2007) (affording sentencing judges discretion to vary from the sentencing range recommended by the federal sentencing guidelines based on a "policy" disagreement with a

## II.     The Evolution of the Child Pornography Statutes and Guidelines

A. The Rapid Ascent of the Criminalization of Child Pornography Offenses

The criminalization of child pornography offenses is a relatively recent occurrence in the history of American criminal justice.  It was not until 1977 that federal law first addressed it – by outlawing production and *commercial* distribution and receipt of child pornography – but did not criminalize non-commercial distribution, receipt, and possession of child pornography until several years later.[8]  Yet, despite its belated action in outlawing child pornography,

---

specific guideline).  The Courts of Appeals are divided on the question of whether a district court may vary below section 2G2.2's recommended sentencing ranges based on a "policy" disagreement with the guideline.  The majority of circuits permit such a variance.  *See United States v. Morrison*, 771 F.3d 687, 692-93 (10th Cir. 2014); *United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012); *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011); *Grober*, 624 F.3d at 592 (3d Cir.); *Dorvee*, 616 F.3d at 184 (2d Cir.); *United States v. Stone*, 575 F.3d 83, 91-94 (1st Cir. 2009); *see also United States v. Pyles*, 851 F.3d 1329, 1333-34 (D.C. Cir. 2017) ("We . . . conclude that, even if a district court retains discretion to vary from the child-pornography Guidelines based on a policy disagreement with them [having previously cited *Stone*, *Grober*, and *Henderson*], a district court does not necessarily abuse its discretion by agreeing with (and applying) those Guidelines."). The Fifth and Eleventh Circuits have rejected such "policy" variances. *United States v. Miller*, 665 F.3d 114, 120-21 (5th Cir.2011) (2012); *United States v. Pugh*, 515 F.3d 1179, 1201 & n.15 (11th Cir.2008). The Sixth Circuit has permitted "policy" variances from section 2G2.2, *United States v. Brooks*, 628 F.3d 791, 799-800 (6th Cir. 2011), but also has rejected the specific argument that such a policy variance is appropriate based on the fact that several of the aggravating factors in section 2G2.2 were required by Congress. *United States v. Bistline*, 655 F.3d 758, 761-64 (6th Cir. 2012).

[8] U.S. SENTENCING COMM., REPORT TO CONGRESS: FEDERAL CHILD PORNOGRAPHY OFFENSES 4 & nn. 22-23 (2012) (hereafter "2012 COMMISSION REPORT"). Congress outlawed non-commercial receipt and distribution in 1984, and outlawed simple possession in 1990. *Id.*

Congress very quickly came to consider such offenses to be among the most serious in the federal system.

Repeated amendments to the statutory provisions and repeated congressional directives to the Sentencing Commission to amend section 2G2.2, from 1990 until 2012,[9] have resulted in some of the most severe federal non-capital penalties – for typical cases – among all common offense types.[10]  The average prison sentence today for offenders convicted of non-production child pornography offenses is 101 months (or nearly 8 and ½ years).[11]  Notably, that average sentence is noticeably below the average guideline range minimum – 139 months – called for by section 2G2.2.[12]  As an indication of the relative severity of child pornography penalties among all federal offense types, the average sentence and guideline minimum are

---

[9] *See* 2012 COMMISSION REPORT, at 4-5; *see also* U.S. SENTENCING COMM., THE HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES (2009) (discussing the many amendments to the guidelines since 1987).  The full list of congressional legislation concerning section 2G2.2 is contained in Appendix E of the Commission's 2012 report.  Most of that legislation either required the Commission to amend the guidelines or directly amended the guideline.

[10] The statutory ranges of punishment for child pornography offenders convicted of their first such offense are 0 to 20 years of imprisonment for simple possession offenses and 5 to 20 years of imprisonment for receipt and distribution offenses.  *See* 18 U.S.C. §§ 2252(b) & 2252A(b). For offenders with prior convictions for sex offenses (including prior child pornography convictions), the ranges of punishment increase significantly – to a mandatory minimum of 10 years for possession offenses (with the same 20-year maximum) and a mandatory minimum of 15 years for receipt and distribution offenses (and a maximum of 40 years). *See id.*

[11] U.S. SENTENCING COMM., MANDATORY MINIMUM PENALTIES FOR SEX OFFENSES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 44 (2019).

[12] *Id.* at 51.

higher than the corresponding averages for federal drug-trafficking offenses

serious enough to carry mandatory minimum statutory penalties.[13]  Furthermore,

the averages for those drug-trafficking offenders reflect much higher average

criminal histories than those for child pornography offenders – meaning the actual

penalty levels for child pornography offenders are actually significantly higher

than those for comparable drug-trafficking offenders.[14]

The comparison to federal drug-trafficking offenses is not intended to

diminish the seriousness of federal non-production offenses. They are, generally

speaking, serious offenses that almost always warrant imprisonment.  Yet there is

wide spectrum of non-production offenses – ranging from the indiscriminate

downloading of digital files to be used solely for self-gratification, to the active

trading of files in sophisticated child pornography online "communities," to the use

of child pornography to "groom" children into participating in sexually-explicit

activities or even facilitate rape.  As discussed below, the current penalty scheme

does a woefully inadequate job of distinguishing among child pornography

---

[13] U.S. SENTENCING COMM., MANDATORY MINIMUM PENALTIES FOR DRUG OFFENSES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 41 (2017) (Figure 25, showing average sentence for federal drug-trafficking offenses carrying mandatory minimums is slightly below 100 months and average guideline minimum for such cases around 130 months).

[14] Only 47.9% of drug-trafficking offenders today in are Criminal History Category I compared to 78.3% of non-production child pornography offenders.  *See* U.S. Sent. Comm'n, *QuickFacts: Drug Trafficking Offenses* 1 (2018); U.S. SENT. COMM'N, MANDATORY MINIMUM PENALTIES FOR SEX OFFENSES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 41 (2019).

offenders in terms of their culpability and dangerousness. The current guideline, in particular, treats the overwhelming majority of offenders as if they are the worst offenders on the spectrum. And, for that reason, sentencing judges sentence below the guideline ranges in the vast majority of cases today.

B. The Evolution of Section 2G2.2

Section 2G2.2 has evolved from a simple guideline carrying very low penalty ranges in the original 1987 *Guidelines Manual*[15] to the current complex guideline carrying severe penalty ranges. The current guideline, which has changed little since 2003, is set forth below:

| Section 2G2.2 [current version] |
| --- |
| (a)  Base Offense Level: <br><br>  (1)  **18**, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7). <br><br>  (2)  **22**, otherwise <br><br> (b)  Specific Offense Characteristics <br><br>  (1)  If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by **2** levels. |

---

[15] The 1987 version of 2G2.2 had a base offense level of 13 and two potential enhancements (a two-level enhancement if the pornography depicted a child under 12 years of age and a minimum five-level enhancement for distribution, with additional levels for "retail values" exceeded $100,000). Thus, for an offender in Criminal History Category I of the Sentencing Table, the most severe penalty range (without any adjustments from Chapter Three of the *Guidelines* and assuming a retail value of $100,000 or less) was 33-41 months (offense level 20/CHC I).

(2)   If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by **2** levels.

(3)   (Apply the greatest):

    (A)   If the offense involved distribution for pecuniary gain, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than **5** levels.

    (B)   If the defendant distributed in exchange for any valuable consideration, but not for pecuniary gain, increase by **5** levels.

    (C)   If the offense involved distribution to a minor, increase by **5** levels.

    (D)   If the offense involved distribution to a minor that was intended to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than illegal activity covered under subdivision (E), increase by **6** levels.

    (E)   If the offense involved distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by **7** levels.

    (F)   If the defendant knowingly engaged in distribution, other than distribution described in subdivisions (A) through (E), increase by **2** levels.

(4)   If the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler, increase by **4** levels.

(5)   If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

(6)   If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by **2** levels.

(7)   If the offense involved—

    (A)   at least 10 images, but fewer than 150, increase by **2** levels;

    (B)   at least 150 images, but fewer than 300, increase by **3** levels;

    (C)   at least 300 images, but fewer than 600, increase by **4** levels; and

    (D)   600 or more images, increase by **5** levels.

(c)   Cross Reference

(1)   If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for

7

> the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

## III.    The (Many) Problems with Section 2G2.2

The Sentencing Commission's 2012 report to Congress sets forth the problems with section 2G2.2.  They can be summarized as follows:

- Most of the enhancements in section 2G2.2 (*e.g.*, "use of a computer," the number-of-images enhancement) were promulgated during an earlier era of computer and internet technologies when the enhancements were intended to apply only in atypical or aggravated cases.  As a result of today's computer and internet technologies, including peer-to-peer (P2P) file-sharing, however, the vast majority of the antiquated enhancement provisions apply to typical defendants.[16]

- The guideline penalty ranges for typical offenders have increased substantially because of the many enhancements added to section 2G2.2 after 1987. Many defendants, including those with no prior criminal records, thus have guideline ranges at or near the statutory maximum range of punishment.    Furthermore, the average guideline range for non-production offenders is not much lower than average guideline ranges for much more serious sexual offenses (*e.g.*, child prostitution and rape of a child between 12 and 17).[17]

- There exists a wide range of defendants in terms of their culpability and dangerousness.  Because the vast majority of the enhancement provisions in section 2G2.2 apply to typical defendants, the guideline does a poor job of distinguishing among defendants in terms of their relative culpability and dangerousness.[18]

- Because several of the provisions in section 2G2.2 were required by

---

[16] 2012 COMMISSION REPORT, at 313.

[17] *Id.* at 315-16; *see also id.* at 137.

[18] *Id.* at 320-25.

Congress (*e.g.*, use-of-a-computer, number-of-images, and sado-masochistic images enhancements) – and not added by the Commission in the normal course of administrative rule-making – the Commission cannot remove them without congressional approval.[19]

· Because section 2G2.2 is outdated and overly severe for typical defendants, the vast majority of sentencing judges refuse to sentence defendants within the recommended guideline ranges and prosecutors increasingly enter into plea bargains with defendants for non-guideline sentences – leading to significant sentencing disparities because there is no meaningful sentencing benchmark.[20]

The Commission's 2012 report not only identified the many problems with section 2G2.2 but also recommended to Congress that an amended guideline should reflect three main factors related to child pornography offenders' culpability and dangerousness:

> [T]he Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases: (i) the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the age of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technologies); (ii) the degree of an offender's involvement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and (iii) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.[21]

---

[19] *Id.* at 322; *see also id.* at E-1 (Appendix E).

[20] *Id.* at 317-18.

[21] 2012 COMMISSION REPORT, at xvii-xviii.

The Commission also observed that: "The current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness. As a result, penalty ranges are too severe for some offenders and too lenient for other offenders. The guideline thus should be revised to more fully account for these three factors and thereby provide for more proportionate punishments."[22]

Little has changed since the Commission identified the problems and proposed a general solution in December of 2012.[23] Although the Commission has not issued a revised report on child pornography offenders during the past seven years – something that would be beneficial to do in view of the continuing controversy about child pornography sentencing[24] – my own regular review of child

---

[22] *Id.* at xviii.

[23] The Commission did amend section 2G2.2 in 2016 in a manner that marginally improved one of the existing enhancements and also added a new enhancement. The 2016 amendment required a *mens rea* for the two-level distribution enhancement and added a *quid pro quo* requirement for the five-level distribution enhancement. It also added a new four-level enhancement for possessing child pornography depicted a baby or toddler (as an alternate enhancement to the existing sado-masochistic enhancement). *See* USSG, App. C, amend. 801 (Nov. 1, 2016). Yet, as discussed below, the within-range rate for the guideline two years after those changes is even lower than it was in 2012.

[24] As discussed below, the Commission's 2012 report proposed that any guideline amendment account for three main factors: (1) the extent of the defendant's collecting behavior; (2) the extent of the defendant's involvement with other child pornography offenders in (usually virtual internet) "communities" devoted to child exploitation; and (3) the defendant's history of sexually exploitative or abusive conduct. *See* 2012 COMMISSION REPORT, at 320. The report had significant empirical data concerning the third factor, *id.* at 169-206, and had limited data about

pornography cases in the Commission's files through 2017 revealed virtually no changes in the statistics and trends discussed in the 2012 report. All of the main problems remain. Indeed, Commission sentencing data show that, if anything, more judges today perceive serious problems with the guideline than ever before. The most telling statistic – the within-range rate for section 2G2.2 – currently stands at 28.4 percent.[25] It was 32.3 percent in 2012, when the Commission issued its report.[26] The current average *extent* of downward variances is 40.1 percent – meaning in those cases in which judges vary downwardly, they impose sentences that are on average 40.1 percent below the average guideline *minimum.*[27]

It is notable that the current 28.4 percent within-range rate is actually artificially inflated by the relatively common practice of plea agreements in which the parties stipulate that the guidelines should apply in a particular way – usually by

---

the community involvement of offenders, *id.* at 193, but did not provide empirical date about offenders' collecting behavior. An updated report could include data about all three factors using more recent federal child pornography cases.

[25] U.S. SENT. COMM., SOURCEBOOK OF FEDERAL SENTENCING STATISTICS S-91 (2018) (Tab. 32, showing 402 of all 1,414 section 2G2.2 cases had within-range sentences). Of all section 2G2.2 cases, 888 (or 62.8%) had downward "variances" and another 88 (6.3%) had downward "departures" (other than for substantial assistance or fast-track). *Id.* "Variances" and "departures" are discussed in *United States v. Myers*, 503 F.3d 676, 684-85 (8th Cir.2007).

[26] U.S. SENT. COMM., SOURCEBOOK OF FEDERAL SENTENCING STATISTICS (2012) (Tab. 28, showing 567 of all 1,755 section 2G2.2 cases (32.3%) had within-range sentences).

[27] U.S. SENT. COMM., SOURCEBOOK OF FEDERAL SENTENCING STATISTICS (2018).

removing the use-of-computer enhancement or the sado-masochism enhancement –
in order to reduce a defendant's guideline range.[28]  Judges who follow those plea
agreements and sentence within the stipulated guideline ranges are classified as
having imposed "within-range" sentences by the Commission – when in fact their
sentences are effectively downward "variances."

In the nearly seven years since the Commission issued the report, Congress
has not given any indication that it intends either to amend the penal statutes
governing child pornography offenses or to give the Commission authority to amend
the provisions of section 2G2.2 required by Congress.   Not even a single
subcommittee hearing in either house has been held in response to the Commission's
lengthy report identifying the many problems with the statutes and guidelines.

It is fair to conclude that Congress does not intend to act, despite the perpetual
chorus of criticism directed at the guidelines, from many federal judges, the
Commission, practitioners, and commentators.  It is regretful, but understandable.
Child pornography is a quintessential "third rail" of politics.[29]  No legislator stands

---

[28] *See* 2012 COMMISSION REPORT, at 222-23.  The Commission's analysis of all 1,117 section
2G2.2 cases in 2010 with guideline stipulations in plea agreements found that 16.9% of all such
cases had stipulations that were "inconsistent with the relevant facts set forth in" presentence
reports or in the factual statement in plea agreements themselves.  *Id.* at 223.  My own review of
section 2G2.2 cases in subsequent years found that this practice only increased since 2010.

[29] *United States v. R.V.*, 157 F. Supp.3d at 266 ("For a congress person, addressing child
pornography is akin to stepping onto the third rail.").

to gain any political capital, and may in fact stand to lose a substantial amount of it, by introducing legislation to reform child pornography penalties (unless if the proposal raises already draconian penalties). Therefore, the Commission need not give Congress any additional time to act.

Once the Commission has a voting quorum of Commissioners,[30] it could begin the process of considering whether to amend section 2G2.2, to the extent that it is permitted to so in view of the legislative constraints. As discussed below, although constraints do exist, the Commission actually has a substantial amount of discretion to amend the guideline, if it wishes to do so. As I also explain below, my proposal is entirely consistent with the findings and broader recommendations made by the Commission in the 2012 report. In the report, the Commission recognized that, even without congressional authorization, the Commission "is able . . . to amend the child pornography" in a "limited manner."[31]   My proposal is more than limited, yet significant changes would be necessary to improve the current dismal rate of within-guideline range sentences imposed.

---

[30] Because of unfilled vacancies, the Commission currently only has two voting Commissioners – two short of the needed four-Commissioner quorum. U.S. SENTENCING COMM'N, 2018 ANNUAL REPORT 2-3 (2019) (noting that, as of second quarter of 2019, only two voting Commissioners sat on the Commission).

[31] 2012 COMMISSION REPORT, at 322.

The proposed amendment, if adopted, would be similar in nature to the Commission's significant amendment of the illegal reentry guideline, section 2L1.2, in 2016. That amendment substantially recalibrated the aggravating factors of the illegal reentry guideline based on data showing that sentencing judges were varying below the guideline ranges in cases with the most severe enhancements.[32] Notably, my proposal is not a dramatic across-the-board reduction in penalty levels for all child pornography offenders. Such an amendment likely would be dead on arrival when Congress engaged in its 180-day review of the amendment pursuant to 28 U.S.C. § 994(p). Similar to the Commission's 2016 amendment to section 2L1.2, my proposal would lower penalty levels for many offenders but would still result in relatively severe ranges for most offenders and quite severe ranges for the worst offenders. The recalibration of the illegal reentry guideline resulted in a significantly higher percentage of cases in which judges impose sentences within the guideline range.[33] I predict that such a recalibration of section 2G2.2 would have an even greater impact on its within-range rate.

---

[32] *See* USSG, App. C, amend. 802 (Nov. 1, 2016) ("[C]omment received by the Commission and sentencing data indicated that the existing 16- and 12-level enhancements for certain prior felonies committed before a defendant's deportation were overly severe. In fiscal year 2015, only 29.7 percent of defendants who received the 16-level enhancement were sentenced within the applicable sentencing guideline range, and only 32.4 percent of defendants who received the 12-level enhancement were sentenced within the applicable sentencing guideline range.").

[33] *Compare* 2016 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS S-82 (59.2% within-range rate), *with* 2018 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 91 (69.3% within-range RATE).

## IV.   A Partial (But Meaningful) Solution to the Problems

At the outset of this section, I set forth a proposed amendment to section 2G2.2 and then offer a section-by-section explanation for my proposal, including an explanation about how the Commission could amend the guideline in the manner that I propose consistent with the existing congressional restraints.

### A. Proposed Amendment

My proposed amendment is as follows:

---

**Amended Section 2G2.2**

(a)   Base Offense Level:

   (1)   **22**, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7).

   (2)   **24**, otherwise

(b)   Specific Offense Characteristics

   (1)   *Reductions in Offense Level*   N/A

      (A)   If (i) subsection (a)(2) applies; (ii) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (ii) the defendant did not intend to traffic in, or distribute, such material, decrease by **2** levels.

      (B)   If the offense did not involve the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, decrease by **2** levels.

      (C)   If the offense involved less than 10 images, decrease by **5** levels.

   (2)   *Increases in Offense Level*

      (A)   (Apply the greatest):

         (i)   If the offense involved: (a) distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the

---

15

minor to engage in prohibited sexual conduct; or (b) distribution to an adult that was intended to cause the sexual exploitation of a minor in violation of 18 U.S.C. § 2251 or cause the procurement of a minor for other illegal sexual purposes, increase by **8** levels.

(ii)   If the offense involved distribution to a minor for any other purpose, increase by **6** levels.

(iii)   If the defendant distributed in exchange for other material involving the sexual exploitation of a minor, increase by **4** levels.

(iv)   If the defendant was convicted under 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7), and knowingly engaged in distribution, other than distribution described in subdivisions (A)(i)-(iii), increase by **2** levels.

(B)   (Apply the greatest):

(i)   If the offense involved material that portrays (i) sadistic or masochistic conduct or other depictions of violence;[34] or (ii) sexual abuse or exploitation of an infant or toddler, increase by **4** levels; or

(ii)   If the offense involved material that depicts a prepubescent minor or a minor who had not attained the age of 12 years, increase by **2** levels.

(C)   If the defendant engaged in activity involving the sexual abuse or exploitation of a minor (other than acts accounted for in subsection (b)(2)(A)(i) or (ii)), increase as follows:   *N/A*

(i)   If the defendant engaged in three or more such acts, each on a separate occasion, increase by **9** levels;

(ii)   If the defendant engaged in two or more such acts, each on a separate occasion, increase by **6** levels; or

(iii)   If the defendant engaged in one such act, increase by **3** levels.

(D)   (Apply the greatest):   *N/A*

(i)   If the defendant engaged in sophisticated collecting activity, increase by **2** levels;

---

[34] A new application note would define "sadistic or masochistic conduct" to mean "conduct that appears to have been intended to cause pain or humiliation" (or words to that effect). This definition would narrow the current definition provided by courts in eleven of the twelve federal circuit courts, which treat sexual penetration of pre-pubescent minor as *per se* sadistic conduct without considering whether the specific sexual act in question actually did so or appeared designed to do so. *See* 2012 COMMISSION REPORT, at 34-35.

16

> (ii)   If the defendant engaged in sophisticated collecting activity for at least two years, increase by **4** levels.[35]
>
> (c)   Cross Reference
>
> (1)   If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

As explained below, this proposed amendment to section 2G2.2 is intended to accomplish two goals: (1) modernize the guideline in terms of its enhancements to reflect the broad range of offenders' conduct today; and (2) reflect the three main relevant sentencing factors identified by the Commission in its 2012 report.

B. Section-by-Section Explanation of Proposed Amendment

1. Base Offense Levels

As shown above, the proposed amendment has two alternate base offense levels, 24 and 22, while the current version of the guideline's alternate base offense levels are 22 and 18.  Although at first blush it appears that the amendment's base offense levels are more punitive than the existing guidelines' two base offense

---

[35] A new application note would define "sophisticated collecting activity" in a manner that captures offenders who engaged in conduct such as maintaining extremely large collections (*e.g.*, over 500 different video files or 5,000 different images) or maintaining their collections in a complex file structure in order to satisfy the defendant's prurient interests.

levels, the amendment's base offense levels actually effectively reduce the existing base offense levels. This is because the amendment's base offense levels account for two levels for use of a computer and five levels for possessing 600 or more images – two aggravating factors, both required by congressional directives, that apply in the vast majority of cases today.[36] Therefore, for the vast majority of cases, the amendment effectively would reduce the two base offense levels by five and three levels, respectively – *i.e.*, from 22 and 18 to 17 and 15. The latter two base offense levels (17 and 15) are the lowest that the Commission may go under

---

[36] USSG § 2G2.2(b)(6) & (b)(7)(D); *see also* U.S. Sent. Comm'n, *Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based (Fiscal Year 2018)*, at 46 (use-of-a-computer enhancement applied in 96.6% of cases, and enhancement for possessing 600 or more images applied in 76.7% of cases), available at *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf.*

By building in the two enhancements required by Congress into the new base offense levels, the Commission would not be reducing penalties for offenders subject to those enhancements, and therefore would be in compliance with the congressional directives. Regarding the most extensive congressional directives – added by the PROTECT Act of 2003 – Congress stated that: "With respect to cases covered by the amendments made by subsection (i) of this section, the Sentencing Commission may make further amendments to the sentencing guidelines, policy statements, or official commentary of the Sentencing Commission, *except that the Commission shall not promulgate any amendments that, with respect to such cases [i.e.. cases with the number-of-images enhancement and sado-masochism enhancement], would result in sentencing ranges that are lower than those that would have applied under such subsection*." Pub. L. 108-21, Title IV, § 401, Apr. 30, 2003, 117 Stat. 668 (Apr. 30, 2003) (emphasis added). Although inartfully drafted, that statutory language certainly appears to have been intended to prevent the Commission from lowering the four-level enhancement for sado-masochistic images and the two- to five-level enhancement based on the number of images possessed. Congress surely did not intend to prohibit the Commission from simply adding five levels into the base level for *all* child pornography defendants and then permitting a five-level reduction for the rare defendant who possessed less than the minimum number of images (10) required for the current two-level enhancement. Such an amendment would not "result in sentencing ranges that are lower than those that would" apply before such an amendment.

existing congressional directives.[37] As explained below, reducing the base offense levels in this manner would give the Commission leeway to add new aggravating factors as part of the overall recalibration.

In addition, the two new base offense levels, when combined with the adjustment in section 2G2.2(b)(1), equate simple possession offenses with simple receipt offenses. After the adjustment (in the case of a defendants convicted of receipt who did not distribute), both types of offenses effectively receive a base offense level of 22 – compared to 24 for distribution offenses. This change was made in recognition of the Commission's 2012 report's finding that simple possession offenses and simple receipt offenses are identical.[38]

### 2. Amended Specific Offense Characteristics

My proposed amendment's new specific offense characteristics are intended to minimize the effect of the outdated enhancements, eliminate double-counting of

---

[37] *See* 2012 COMMISSION REPORT, at Appendix E, at E-1. In 2004, the Commission chose to make the two base offense levels higher than Congress required. That choice perhaps made sense when the vast majority of offense characteristics did not apply to a typical defendant. However, now that the vast majority of specific offense characteristics apply to a typical offender – resulting in extremely high guideline ranges – the Commission should effectively reduce the two base offense levels, together with a recalibration of the aggravating factors in the specific offense characteristics.

[38] *See* 2012 COMMISSION REPORT, at xx (noting the Commission's finding that "the typical case in which an offender was prosecuted for possession was indistinguishable from the offense conduct in the typical case in which an offender was prosecuted for receipt").

aggravating factors, and better account for the three main factors identified by the Commission in its 2012 report.

i.  New Section 2G2.2(b)(1)

This new section includes the existing two-level reduction for defendants convicted of receipt of child pornography but who did not distribute child pornography (thus punishing offenders who merely received child pornography in the same manner as the guideline punishes simple possessors).  It also includes two additional reductions – one for possessing less than the minimum number of images (10) that currently triggers an enhancement for possessing certain numbers of images; and a second for not using a computer in the commission of the offense.[39]  Because virtually all defendants use computers in the commission of their offenses and also possess 10 or more images, these two provisions would rarely ever apply.  But they are included to give effect to the outdated congressional directives mentioned above.

---

[39] The minimum 10-images number was chosen for simplicity's sake rather than having a tiered reduction along the lines of the current number-of-images enhancement in section 2G2.2(b)(7). As noted above, the vast majority of offenders today receive the five-level enhancement for possessing 600 images or more.

ii.  New Section 2G2.2(b)(2)

This amended section includes several changes to the current guideline's main enhancements. First, is simplifies and recalibrates the existing six-prong enhancement for distribution of child pornography. The amendment has only four prongs. It increases the enhancements for distribution to a minor from 5, 6, or 7 levels to 6 or 8 levels. One of the three factors identified by the Commission as warranting an increased sentence is sexually abusive, exploitative, or predatory conduct, particularly toward children. Therefore, the amended guideline increases the existing penalty for distributing child pornography to minors. It also includes an eight-level enhancement for cases involving a defendant who distributed child pornography to another adult with the intent of having the recipient either produce new child pornography with a child or provide access to a child for illegal sexual purposes.[40]

The third prong provides a four-level enhancement for *quid pro quo* exchanges of child pornography, typically done in "closed" peer-to-peer communities, such as Gigatribe or traditional password-protected internet "bulletin boards."[41] The fourth prong – which amended the existing two-level enhancement

---

[40] The existing version of the distribution enhancement only provides for a five-level enhancement for such distribution. *See* USSG § 2G2.2(b)(3)(B) & comment. (n. 1).

[41] 2012 COMMISSION REPORT, at 48-53, 92-95, 148-52. The amended provision narrows the current enhancement, which applies to distribution "in exchange for any valuable consideration,

21

for simple distribution (in current section 2G2.2(b)(F) – no longer applies to offenders convicted of distribution or receipt offenses. Applying the two-level distribution enhancement to distribution and receipt offenders is duplicative of the enhanced offense levels that such defendants already receive for distribution in the base offense levels and the adjustment in current section 2G2.2(b)(1).[42] Thus, the fourth prong of the amended distribution provision only applies to the offenders convicted of possession offenses who in fact engaged in distribution (other than the types described in the first three prongs). Such defendants should be treated in the same manner as defendants convicted of distribution or convicted of receipt but who in fact distributed. Finally, the amended distribution provision also deletes the current *commercial* distribution enhancement in section 2G2.2(b)(3)(A) because no child pornography offenders prosecuted today distribute for pecuniary gain.[43]

---

but not for pecuniary gain." USSG § 2G2.2(b)(3)(B). That breadth of that enhancement encompasses offenders who may have exchanged pornography for the mere ability to download more child pornography files or download in a faster manner. *See* USSG § 2G2.2, comment. (n.1). Such offenders should not be equated to offenders who trade child pornography for more child pornography.

[42] In the current guideline, a defendant receives a base offense of 22 if he is convicted of distribution. If a defendant was convicted of receipt but actually distributed, he also receives an offense level of 22. If he was convicted of receipt but did not distribute, his offense is reduced by two levels to 20. *See* USSG § 2G2.2(a) & (b)(1).

[43] 2012 COMMISSION REPORT, at 149 (noting that none of the 1,080 section 2G2.2 offenders in 2010 engaged in commercial distribution).

Second, the amended guideline merges two of the existing specific offense characteristics – a two-level enhancement for possessing images depicting pre-pubescent minors (currently in section 2G2.2(b)(2)) and a four-level enhancement for possessing sadomasochistic images or images of babies or toddlers (currently in section 2G2.2(b)(4)).  The former enhancement applies to virtually all cases today and was not required by Congress (and thus can be merged into another enhancement provision without contravening any congressional directive).[44] Merging it into the other enhancement while requiring a court to apply only the greatest enhancement (+2 or +4, but not both) would reduce the double-counting that currently occurs because both enhancements apply in the vast majority of cases.[45]

Third, the proposed amendment includes a tiered enhancement for a defendant's "pattern of activity," which is currently a single five-level enhancement for a defendant who has a history of committing two or more acts of

---

[44] *See* 2012 COMMISSION REPORT, App. E, at E-1.

[45] Double-counting currently occurs because virtually all images depicting sado-masochistic conduct also involve a pre-pubescent minor.  In 2018, the 2-level enhancement for possession of an image of a pre-pubescent minor applied in 94.1% of cases, and the sado-masochistic or baby/toddler enhancement applied in 84.1% of cases.  *See* U.S. Sent. Comm'n, *Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based (Fiscal Year 2018)*, at 45, available at *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf*.

sexual abuse or exploitation of a minor.  The new, tiered enhancement would provide for a three-, six-, or nine-level enhancement for defendants depending on whether they previously committed one, two, or three (or more) prior acts of sexual abuse or exploitation of a minor.[46]  This amended enhancement better reflects the Commission's belief that, when child pornography defendants have histories of sexually abusive, exploitative, or predatory conduct toward children, they should be punished more severely by providing for incremental enhancement levels depending on the extent of that history.  This change does not *lower* the congressionally-required five-level enhancement for two or more acts,[47] so it would not violate the congressional directive.  Indeed, it *increases* that enhancement by one or four levels for defendants who currently receive the five-level enhancement for two or more predicate acts.

Finally, the proposed amendment includes a new two-level enhancement for defendants who engaged in "sophisticated collecting activity," such as organizing an extremely large number of child pornography files in a complex folder structure.  For offenders who engaged in such sophisticated collecting behavior for at least two years, their enhancement is four rather than two levels in recognition of

---

[46] The enhancement would not apply to acts of distributing child pornography to minors because the defendant already would receive a significant enhancement for that behavior under the amended distribution enhancement.

[47] *See* 2012 COMMISSION REPORT, App. E, at E-1.

the prolonged nature of their offense. This new enhancement reflects another factor identified by the Commission in its 2012 report.

### 3. Examples of How the Amended Guideline Would Work in the Real World

The following four hypothetical cases are realistic fact-patterns that reflect what judges regularly see in non-production child pornography cases. Following each scenario are the hypothetical defendants' guideline ranges under both the current guideline and my proposed amended guideline. Consistent with real cases, all fivee defendants are in Criminal History Category I and received a downward adjustment of three levels for acceptance of responsibility under USSG §3E1.1.

**Scenario One: Non-aggravated Simple Possessor**

The defendant used an "open" peer-to-peer (P2P) file-sharing program to download several child pornography videos but did not activate the sharing function (thus, the defendant did not distribute to anyone). One of the videos depicts limited penetration of a prepubescent minor but none depict intentional infliction of pain or humiliation. The defendant did not maintain an organized collection of child pornography files and had only downloaded child pornography for a few months before being arrested. The defendant has no known history of sexual abuse of exploitation of a minor. The defendant was convicted of one count

of possession of child pornography under § 2252(a)(4)(B) and faces a statutory

range of punishment of 0-20 years of imprisonment.

| Current Guideline Calculation | | Amended Guideline Calculation | |
|---|---|---|---|
| Base Offense Level | 18 | Base Offense Level | 22 |
| Pre-Pubescent Minor | +2 | Pre-Pubescent Minor | +2 |
| Sado-Masochism/ Babies/Toddlers | +4 | Sado-Masochism/ Babies/Toddlers | |
| Use of a Computer | +2 | | |
| 600+ images | +5 | | |
| Acceptance | -3 | Acceptance | -3 |
| Final Offense Level [Guideline Range] | 28 [78-97 months] | | 21 [37-46 months] |

### Scenario Two: Unsophisticated Possessor with History of Sexual Abuse

The defendant's former landlord discovered that the defendant had left two

dozen still images of post-pubescent but clearly underage females sexually

exposing themselves. The images were printed from computer websites at some

point in the past (but there was no evidence that the defendant himself was the one

who had accessed the computer). Although he had never been convicted of a sex

offense before, the defendant had been arrested and prosecuted 12 years before for

sexually abusing a minor on five separate occasions. The case was resolved by a

plea bargain to non-sexual assault of a child, for which the defendant served 180

days in jail. The presentence report established that the defendant had sexually

assaulted the minor on the five occasions.  The defendant was convicted of one count of possession of child pornography under § 2252(a)(4)(B) and faces a statutory range of punishment of 0-20 years of imprisonment.

| Current Guideline Calculation | | Amended Guideline Calculation | |
|---|---|---|---|
| Base Offense Level | 18 | Base Offense Level | 22 |
| Pattern of Activity | +5 | Pattern of Activity | +9 |
| Number of Images | +2 | Acceptance | -3 |
| Acceptance | -3 | | |
| Final Offense Level [Guideline Range] | 22 [41-51 months] | | 28 [78-97 months] |

## Scenario Three: Unsophisticated Passive Distributor

The defendant used an "open" peer-to-peer (P2P) file-sharing program to download several of child pornography videos but did activate the sharing function (thus, the defendant indiscriminately distributed to strangers but did not do so in a *quid pro quo* manner).  Two of the videos depict penetration of prepubescent minors with indications of pain on the children's faces.  The defendant did not maintain an organized collection of child pornography files and had only downloaded child pornography for a few months before being arrested.  The defendant has no known history of sexual abuse of exploitation of a minor.  The defendant was convicted of one count of distribution of child pornography under §

2252(a)(4)(B) and faces a statutory range of punishment of five to 20 years of imprisonment.

| Current Guideline Calculation | | Amended Guideline Calculation | |
|---|---|---|---|
| Base Offense Level | 22 | Base Offense Level | 24 |
| Pre-Pubescent Minor | +2 | Pre-Pubescent Minor | |
| Simple Distribution | +2 | Simple Distribution (Possession Offenses) | |
| Sado-Masochism/ Babies/Toddlers | +4 | Sado-Masochism/ Babies/Toddlers | +4 |
| Use of a Computer | +2 | | |
| 600+ images | +5 | | |
| Acceptance | -3 | Acceptance | -3 |
| Final Offense Level [Guideline Range] | 34 [151-188 months] | | 25 [57-71 months][48] |

### Scenario Four: Active Distributor with Single Instance of Prior Sexual Abuse of a Minor and Sophisticated Collecting Behavior

The defendant used a "closed" P2P file-sharing program to trade several child pornography videos with other P2P users in a *quid pro quo* manner. Several of the videos possessed by the defendant depict penetration of toddlers. The defendant maintained his collection of child pornography in a complex file structure, and a forensic computer analysis showed that he had collected child

---

[48] Because the defendant was convicted of distribution, which carries a 60-month mandatory minimum penalty, the defendant's actual guideline range is 60-71 months. *See* USSG § 5G1.1(c).

pornography for 18 months. The presentence report established that the defendant had sexually abused his 12-year old neighbor on one occasion in the past. The defendant was convicted of one count of distribution of child pornography under § 2252(a)(2) and faces a statutory range of punishment of five to 20 years of imprisonment.

| Current Guideline Calculation | | Amended Guideline Calculation | |
|---|---|---|---|
| Base Offense Level | 22 | Base Offense Level | 24 |
| Pre-Pubescent Minor | +2 | Pre-Pubescent Minor | |
| Active Distribution | +5 | *Quid Pro Quo* **Distribution** | +4 |
| Sado-Masochism/ Babies/Toddlers | +4 | Sado-Masochism/ Babies/Toddlers | +4 |
| Pattern of Activity | | Pattern of Activity | +3 |
| Use of a Computer | +2 | | |
| 600+ images | +5 | | |
| | | Sophisticated Collector | +2 |
| Acceptance | -3 | Acceptance | -3 |
| **Final Offense Level [Guideline Range]** | 37 [210-262 months] | | 34 [151-188 months] |

**Scenario Five: Active Distribution with a Significant History of Sexual Abuse of Minors and Sophisticated Collecting Behavior for Several Years**

The defendant used a "closed" P2P file-sharing program to trade several child pornography videos with other P2P users in a *quid pro quo* manner. The defendant also used a social media application to communicate with a 12-year female. He sent her child pornography videos using that social media application and asked her to travel to meet him in order to engage in the types of sexual activities depicted in those videos (which she declined to do). Several of the videos possessed by the defendant depict penetration of toddlers. The defendant maintained his collection of child pornography in a complex file structure, and a forensic computer analysis showed that he had collected child pornography for several years. The presentence report establishes that three decades earlier the defendant was convicted of sexually abusing his step-sister when she was six years old. In addition, the presentence report established that in the past decade the defendant had sexually abused a 12-year old neighbor. The defendant was convicted of one count of distribution of child pornography under § 2252(a)(2) and faces a statutory range of punishment of 15 to 40 years of imprisonment (based on his prior conviction).

| Current Guideline Calculation | | Amended Guideline Calculation | |
|---|---|---|---|
| Base Offense Level | 22 | Base Offense Level | 24 |
| Pre-Pubescent Minor | +2 | Pre-Pubescent Minor | |
| Distribution to a Minor With Intent to Commit a Sex Offense | +6 | Distribution to a Minor With Intent to Commit a Sex Offense | +8 |
| Sado-Masochism/ Babies/Toddlers | +4 | Sado-Masochism/ Babies/Toddlers | +4 |
| Pattern of Activity | +5 | Pattern of Activity | +6 |
| Use of a Computer | +2 | | |
| 600+ images | +5 | | |
| | | Sophisticated Collector | +4 |
| Acceptance | -3 | Acceptance | -3 |
| Final Offense Level [Guideline Range] | 43 [life] | | 43 [life][49] |

### 4. One Additional Proposed Fix: A Change in the Recommended Lifetime Term of Supervised Release in USSG §5D1.2(b)

One final change that the Commission could accomplish without congressional permission would be to amend the policy statement in USSG §5D1.2(b), which currently reads: "If the instant offense of conviction is a sex offense, however, the statutory maximum term of supervised release is

---

[49] Because the statutory maximum is 40 years, the actual guideline range is simply 40 years. *See* USSG § 5G1.1(a).

recommended." "Sex offense" is defined as include non-production child pornography offenses in Chapter 109A of Title 18 of the United States Code.[50]

In its 2012 report, the Commission noted that this recommendation was first included in section 5D1.2 at a time when the maximum term of supervision for child pornography offenses was three years. When Congress raised the maximum term of supervised release for child pornography offenses to life in 2003, that application note had the effect of recommending lifetime terms of supervised release for all child pornography defendants.[51] The Commission thus never intended that recommendation of lifetime supervision.

The recommendation makes no sense for typical child pornography offenders, who are unlikely to recidivate upon release from prison, according to the Commission's study of recidivism of child pornography offenders.[52] The Commission should amend section 5D1.2 to state that a court should only impose a substantial term of supervision – say, beyond 10 years – if the evidence in a particular case warrants such a term. Lifetime terms should be reserved for the most serious, dangerous offenders.

---

[50] USSG §5D1.2(b), comment. (n.1).

[51] 2012 COMMISSION REPORT, at 325-26.

[52] 2012 COMMISSION REPORT, at 299-310.

## V.    Conclusion

The current penalty structure for non-production offenses is fundamentally broken, as evidenced by the fact that only 28.4 percent of defendants sentenced under section 2G2.2 receive within-range sentences and 69.1 percent of defendants receive downward variances or departures (unrelated to their substantial assistance or participation in a fast-track program).  The vast majority of child pornography defendants receive downward variances based on sentencing judges' subjective senses of what appropriate sentences should be.  Because judges have no meaningful national benchmark from which to render sentencing decisions, widespread sentencing disparities exist – in conflict with the central purpose of the Sentencing Reform Act of 1984.[53]  In addition, because the current guideline fails to offer any meaningful benchmark, federal prosecutors around the country engage in a wide variety of different charging and plea-bargain practices resulting in significant sentencing disparities among similar defendants.

The Commission's December 2012 report has fallen on deaf ears in Congress.  As soon as it gets a voting quorum, the Commission should act to the

---

[53] *See* 28 U.S.C. § 991(b)(1)(B) (requiring the Sentencing Commission to promulgate guidelines that "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"); *see also* 18 U.S.C. 3553 § 3553(a)(6) (similarly instructing sentencing judges "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

extent it is permitted within the legislative constraints imposed by Congress concerning section 2G2.2. As this article demonstrates, the Commission actually has a substantial amount of leeway to amend the guideline consistent with both the legislative directives as well as with the Commission's recommendation in its report. Although the Commission may not adopt the specific offense levels in my proposal, the Commission should at least recalibrate the aggravating factors in the existing version of section 2G2.2 to better reflect the three factors identified in the Commission's 2012 report and set penalty levels that account for the wide spectrum of offender conduct. In addition, the Commission should eliminate the duplicative aggravating factors identified above.

Amending section 2G2.2 in the manner proposed in this article would result in reductions in penalty ranges for many defendants, yet the sentencing ranges would still be relatively severe – very few defendants would have sentencing ranges with minimums of less than three or four years, and most defendants would have ranges with minimums between five and ten years. The worst defendants would have guideline ranges comparable to – or even higher than – the ones currently called for by the guideline (at or near the life-sentence range). Moreover, the ranges for all child pornography defendants would be based on the common-sense factors identified by the Commission in its report rather than the antiquated and often unduly severe factors in the current guideline. An amended guideline

that is based on the three factors identified by the Commission and that also eliminates the duplicative aggravating factors in the current guideline likely would result in more consistent prosecutorial charging and plea-bargaining practices and also more within-range sentences by federal district judges.  The current unacceptable degree of unwarranted sentencing disparities thus would be reduced.

*Exhibit 5*



## Individualized Reentry Plan - Program Review (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: SMITH, LARRY GUY 08520-027

**SEQUENCE: 01362732**
**Team Date: 04-16-2020**

| | |
|---|---|
| Facility: | LOR LORETTO FCI |
| Name: | SMITH, LARRY GUY |
| Register No.: | 08520-027 |
| Age: | 37 |
| Date of Birth: | 05-17-1982 |

| | |
|---|---|
| Proj. Rel. Date: | 12-06-2022 |
| Proj. Rel. Mthd: | GCT REL |
| DNA Status: | MIL02944 / 03-30-2011 |

### Detainers

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| LOR | PLUMB SHOP | PLUMBING SHOP | 06-11-2019 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| LOR | ESL HAS | ENGLISH PROFICIENT | 04-30-2008 |
| LOR | GED HAS | COMPLETED GED OR HS DIPLOMA | 04-30-2008 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| LOR | C | BASSGUITAR CLASS FCI | 08-05-2019 | 10-07-2019 |
| LOR | C | PASTEL ART CLASS FCI | 05-25-2019 | 08-09-2019 |
| LOR | C | INTRODUCTION TO FILM | 10-15-2018 | 12-19-2018 |
| LOR | C | CONVERSATIONAL SPANISH | 07-17-2018 | 09-22-2018 |
| LOR | C | GUITAR CLASS FCI | 07-16-2018 | 08-31-2018 |
| BTF GP | C | ACE SPANISH 3 | 05-01-2018 | 07-17-2018 |
| BTF GP | C | SPANISH 2 | 01-19-2018 | 04-16-2018 |
| BTF GP | C | INTRODUCTORY TO SPANISH | 12-01-2017 | 01-08-2018 |
| BTF GP | C | INTRODUCTION TO HOBBYCRAFT | 03-07-2017 | 03-11-2017 |
| BTF GP | C | PRE IND SEWING M-T 0730-1030 | 02-13-2017 | 03-07-2017 |
| BTF GP | C | (W)MANAGE PERSONAL STRESS-CAI | 10-21-2016 | 12-08-2016 |
| BTF GP | C | (W)BLOOD-BORNE PATHOGENS | 10-21-2016 | 11-01-2016 |
| BTF GP | C | (W)BASIC FIRST AIDE-CAI | 10-21-2016 | 12-06-2016 |
| BTF GP | C | (W)BACK SAFETY | 10-21-2016 | 11-03-2016 |
| BTF GP | C | (G)CRITICAL THINKING-CAI | 07-10-2016 | 10-06-2016 |
| BTF GP | C | PSY. MGT DRUG ABUSE EDUCATION | 08-02-2016 | 08-17-2016 |
| SEA | C | STRESS MANAGEMENT        6 | 05-04-2015 | 05-04-2015 |
| SEA | C | TYPING AND KEYBOARDING CLASS | 02-27-2014 | 04-07-2014 |
| SEA | C | BEGINNING PENCIL ART CLASS/REC | 10-07-2013 | 12-16-2013 |
| SEA | C | ADMISSION AND ORIENTATION | 12-27-2012 | 12-27-2012 |
| SEA | C | RELEASE REQUIREMENTS     5 | 12-27-2012 | 12-27-2012 |
| MIL | C | LEISURE-BASICS REC #338 | 11-20-2011 | 11-23-2011 |
| MIL | C | CAREER RES CTR COMPTR TRAINING | 03-09-2011 | 03-09-2011 |
| MIL | C | UNICOR BLUE PRT TRADE TRAINING | 12-06-2010 | 12-13-2010 |
| MIL | C | RECREATION - WALKING/JOGGING | 09-01-2009 | 09-04-2009 |
| MIL | C | NAT FED/PER TR CRS TT 1230-230 | 03-15-2009 | 05-05-2009 |
| MIL | C | WELLNESS CLASS T/T 12:30-2:30P | 03-01-2009 | 03-27-2009 |
| MIL | C | MARRIAGE AND RELATIONSHIPS | 12-02-2008 | 12-25-2008 |
| MIL | C | SMALL BUS SUCC WED 5:30-7:30PM | 10-29-2008 | 11-19-2008 |
| MIL | C | INDEPENDENT STUDY; VARIOUS SUB | 07-09-2008 | 08-05-2008 |
| MIL | C | PER FIN MGMT TH PD1 7:30-9:30A | 07-10-2008 | 07-31-2008 |
| MIL | C | A&O COMPLT | 04-23-2008 | 04-23-2008 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*\*\* NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS \*\**

### Current Care Assignments



**Individualized Reentry Plan - Program Review (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SMITH, LARRY GUY  08520-027

SEQUENCE: 01362732
Team Date: 04-16-2020

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 04-29-2008 |
| CARE1-MH | CARE1-MENTAL HEALTH | 06-22-2010 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 02-18-2020 |
| YES F/S | CLEARED FOR FOOD SERVICE | 09-19-2016 |

**Current Drug Assignments**

| Assignment | Description | Start |
|---|---|---|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 11-05-2019 |
| ED COMP | DRUG EDUCATION COMPLETE | 08-17-2016 |
| NR COMP | NRES DRUG TMT/COMPLETE | 12-28-2018 |

**FRP Details**

Most Recent Payment Plan

** NO FRP DETAILS **

**FRP Assignment:**    **COMPLT    FINANC RESP-COMPLETED**        **Start: 05-09-2008**

Payments past 6 months:       **$0.00**              Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

** NO ADJUSTMENTS MADE IN LAST 6 MONTHS **

**Payment Details**

Trust Fund Deposits - Past 6 months: $1,174.44          Payments commensurate ?   N/A
New Payment Plan:       ** No data **

**Progress since last review**

Inmate Smith has obtained his social security card which will be obtained in his central file until release.

**Next Program Review Goals**

When the Education Department reopens, unit team recommends enrolling in and completing at least one ACE/VT Program by September 15, 2020, such as: HVAC Electrical Theory Certification and/or Human Physiology.

In addition, recommend participating in one Wellness related activity by September 15, 2020, such as: Aerobics, Spinning, Yoga, and/or Bicycling.

**Long Term Goals**

Inmate Smith will be reviewed for residential reentry center placement 17-19 months prior to GCT Release Date 12-06-2022.

Recommend completing one Psychology related program by 04/2022, such as: Risk Management and/or Anger Management.

**RRC/HC Placement**

No.
Management decision - Will review 17-19 months prior to release..

**Comments**

Sentencing District: Northern District of Indiana

Finance/Poverty Need Screen Is there documentation in the PSR of any of the following? __ Any history of Bankruptcy __ No bank account __ No assets nor liabilities noted in PSR _x_ Debts noted in Credit Report or other sources __ Tax Liabilities/back taxes __ Unpaid alimony/child support __ Other indications of lack of financial management skills (specify)_____ YES __X____ NO _____ (if any of the above, check yes) If the answer is yes, the inmate has a financial/poverty skills need.



**Individualized Reentry Plan - Program Review  (Inmate Copy)**

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: SMITH, LARRY GUY  08520-027

SEQUENCE: 01362732

Team Date: 04-16-2020

<u>Amendment to Motion</u>

While waiting for mail pick up to come around so I could send this motion in to the courts, my room was removed from the unit and placed in quarantine. Four out of eight tested positive for COVID-19, including me. Besides us, 21 other inmates tested positive today, bringing the total up to 53 inmates thus far since the first tested positive on the 18th of July, with more test results still pending.

My lab results from the first test I took on the 20th of July came back negative. So between then and now, I contracted the virus, possibly from the individuals allowed to return to the unit while still positive. I have been placed in the unit for confirmed positives with 31 other inmates.

The conditions in this unit are inadequate, to say the least. There are only two sinks, one urinal and two toilets, due to the third one being broken. There is no officer stationed on the unit and no emergency call button or phone to reach out to medical if an issue should arise with one of us infected individuals. The officer makes rounds hourly.

Also, upon arriving in this "quarantine" unit, we were informed we would receive bedrolls, clothing, and hygiene supplies shortly. Eight to ten hours later, we received two blankets a piece. No clothing, no hygiene, no linen, no towels or wash cloths to wash with. We were told the two blankets was the best that could be done

— 1—

on short notice because there was no clean items inside laundry. No Hygiene Kits or bedrolls made up. Nothing in preparation for handling more COVID-19 positive cases. The information given to us was "Somebody dropped the ball".

There has been no less than 3 weeks to prepare for this situation, since the first staff member tested positive, and more like 5 months, when Phase One was issued by the BOP. There is no reason administration should not have had at least the bare minimum of blankets, linen, hygiene, towels, and washclothes ready for if and when the pandemic reaches within their walls.

Today has been more proof that FCI Loretto can not contain this virus from spreading and can not properly manage and care for the sick individuals infected with the virus. Nobody at FCI Loretto was handed a death sentence, but it seems the administration is attempting to deal one out to one or more individuals by neglecting to prepare theirselves or their institution for an outbreak.

Respectfully,
Larry Smith

—2—